UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-2408 PA (AJWx) | Date | January 4, 2016 |
|---|---|---|---|
| Title | Maria Banuelos v. UPS Ground Freight, Inc. | | |

| Present: The Honorable | PERCY ANDERSON, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Stephen Montes Kerr | Not Reported | N/A |
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:** IN CHAMBERS – COURT ORDER

Before the Court is a Motion for Summary Judgment filed by defendant UPS Ground Freight, Inc. ("UPS" or "Defendant") (Docket No. 24). Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument. The hearing calendared for January 4, 2016, is vacated, and the matter taken off calendar.

**I.    Factual and Procedural Background**

Plaintiff Maria Banuelos ("Banuelos" or "Plaintiff") began working for UPS in 2003 and currently works there as an Operations Supervisor. (UPS's Statement of Facts ("SOF") ¶ 3.) Operations Supervisors may be assigned to work in dispatch (called "Dispatch Supervisors") or on the loading dock (called "Dock Supervisors"). (SOF ¶ 4.) Dispatch Supervisors manage the hourly drivers who pick up and deliver freight to UPS customers in the community by ensuring that the proper number of drivers are put on the road, and all deliveries and pickups are made on time. (SOF ¶ 5.) Dock Supervisors manage the hourly dock workers who load and unload freight onto trailers in UPS hubs by ensuring that trailers are loaded and unloaded in a safe and timely manner. (SOF ¶ 6.)

Although Plaintiff's Complaint alleges that she was terminated by UPS, Plaintiff acknowledges that those allegations are not accurate. (SOF ¶ 7.) Plaintiff became a full-time Dispatch Supervisor in February 2011 before she requested reassignment in March 2014, at which time she became a Dock Supervisor. (SOF ¶ 8.) Specifically, Banuelos worked as an Operations Supervisor at UPS Freight's Rialto ("RIA") facility in 2012 and 2013, and in its Commerce ("LOS") facility from January 2014 until the present. (SOF ¶ 9.)

Mordie Pearson ("Pearson") became the Southern California Regional Director of Operations in May 2012. (SOF ¶ 10.) Pearson is responsible for managing UPS's Rialto and Commerce facilities, among others. (Id.) According to Plaintiff, Pearson's management style focuses on holding employees accountable. (SOF ¶ 11.) Pearson has several specific processes that he requires his management personnel to perform, such as the process for holding drivers accountable for missed pickups. (SOF ¶ 12.) According to Plaintiff, Pearson would call-out supervisors who did not follow his processes and hold drivers accountable for service failures. (SOF ¶ 13.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-2408 PA (AJWx) | Date | January 4, 2016 |
|---|---|---|---|
| Title | Maria Banuelos v. UPS Ground Freight, Inc. | | |

Despite the fact that Plaintiff does not like Pearson's management style, Plaintiff testified that there were only two instances where she feels Pearson mistreated her. (SOF ¶ 14.) First, as part of his focus on accountability, Pearson would hold conference calls with several members of management to review telematics data, ask questions about why their driver teams had missed pickups or deliveries, and discuss how the drivers were held accountable. (SOF ¶ 15.) Plaintiff participated in only two such calls with Pearson and others, which occurred on February 18 and 21, 2013. (SOF ¶ 16.) According to Plaintiff, she "was unable to provide [Pearson] with the answers he wanted and was given one hour to obtain the information despite the fact that [she] would be off work in 45 minutes." (SOF ¶ 17.) Following the second conference call, Plaintiff contacted UPS's hotline and filed an anonymous complaint against Pearson, alleging that he made her "feel like he/she was two years old" and he "belittl[ed]" her. (SOF ¶ 18.) Although Banuelos now states that she believes Pearson treated her differently because she is a woman, when she made the complaint to the hotline, she did not assert that Pearson treated her differently because she belongs to a protected class or was engaged in protected activity. (SOF ¶ 19.) Plaintiff admits that she has no idea how Pearson treated other members of management, or whether he talked to them about their job performance on conference calls the same way he talked to her. (SOF ¶ 20.) After investigating Plaintiff's complaint by interviewing other people on the conference calls, UPS concluded that Pearson had not acted inappropriately toward Plaintiff in any respect. (SOF ¶¶ 21 & 22.)

Plaintiff's only other complaint against Pearson occurred when he emailed a group of supervisors and asked them all to respond to his email confirming their understanding of the missed pickup process. (SOF ¶ 23.) Everyone followed Pearson's instructions and responded to his email except Plaintiff and another Dispatch Supervisor named William Hills. (SOF ¶ 24.) On February 25, 2014, Pearson called Plaintiff and Hills into his office and asked them to sign a hard-copy of his email, confirming that they understood the missed pickup process. (SOF ¶ 25.) Hills signed the email as instructed, but Plaintiff initially refused, and demanded that Pearson write a specific exception to the process on his email before she would sign it. (SOF ¶ 26.) When Pearson suggested that Plaintiff was being insubordinate by refusing to sign the email, Plaintiff signed the email "under distress [sic]," at which point the meeting ended. (SOF ¶ 27.) Pearson did not take any disciplinary action against Plaintiff or Hills, and Plaintiff acknowledges that Pearson treated her exactly as he had treated Hills (a male) who also failed to follow his instructions. (SOF 28.) UPS investigated Plaintiff's complaint and determined that Pearson had not acted inappropriately or treated her differently based on any protected class or protected activity. (SOF ¶ 31.)

Plaintiff went out on a leave of absence following her anonymous February 22, 2013 hotline complaint against Pearson. (SOF ¶ 32.) Plaintiff's Complaint alleges that she suffers from an anxiety disorder and depression. (SOF ¶ 33.) During her deposition, when asked about her anxiety disorder, Plaintiff testified:

> Q   When did the anxiety start?
> A   It started when Mordie came in.
> Q   So, approximately, 2011 for the very first time you developed anxiety in your life?

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-2408 PA (AJWx) | Date | January 4, 2016 |
|---|---|---|---|
| Title | Maria Banuelos v. UPS Ground Freight, Inc. | | |

> A   It got worse.
> Q   So you had anxiety before Mordie was appointed the regional director of operations; right?
> A   Well, yeah. I mean, we all have anxiety but it's -- it's -- it got worse throughout that time.
> Q   Before Mordie came on as a regional director in 2011, have you been treated by a doctor for your anxiety or seen any -- kind of counselor to receive treatment for your anxiety?
> A   No, sir.

(Id.) Similarly, when asked about her depression during her deposition, Plaintiff testified:

> Q   Okay. What about your depression, when did that start?
> A   It started also when Mordie came into the picture.
> Q   So you hadn't had any depression symptoms prior to Mordie Pearson becoming regional director at UPS in 2011?
> A   I don't feel like I was depressed, no.
> Q   Have you seen any doctors or counselors or received any treatment for depression before 2011?
> A   No, sir.

(Id.) Due to an administrative error, Plaintiff initially received full pay during her leave of absence, even though it had not been approved as FMLA leave, workers' comp, or short-term disability. (SOF 35.) During this time, UPS attempted to contact Plaintiff several times, but she refused to take the company's calls. (SOF ¶ 36.) UPS corrected its payroll error, and stopped Plaintiff's pay on March 31, 2013. (SOF ¶ 38.)

On April 8, 2013, Plaintiff reported back to work with an Occupational Injury Status Report from Dr. Tauran, which stated: "DIAGNOSIS: Employee Conflict. WORK STATUS: She is cleared to return to Modified Duty as of 4/08/13. WORK MODIFICATIONS: Avoid working at Rialto Terminal. DISPOSITION: Referred to specialist: Psychiatric." (SOF ¶ 39.) UPS then began an interactive process and Plaintiff applied for a job-related accommodation on April 18, 2013. (SOF ¶ 40.) UPS sent Banuelos a letter dated April 18, 2013, which acknowledged her request for a job-related accommodation and asked her healthcare provider to complete a "Request for Medical Information" form that sought additional medical information regarding her reported condition and how it impacted her ability to work at UPS. (SOF ¶ 41.) Plaintiff states that UPS did not contact her until early May 2013, when she received a letter from UPS asking Dr. Tauran to fill out a form. (Plaintiff's Material Facts ("PMF") ¶ 414.) Notwithstanding whether Plaintiff received UPS's April 18, 2013 letter, UPS sent a second letter, dated May 2, 2013, again requesting the medical information and noting that UPS "cannot continue our assessment of your request until we receive the completed medical forms." (SOF ¶ 42.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-2408 PA (AJWx) | Date | January 4, 2016 |
|---|---|---|---|
| Title | Maria Banuelos v. UPS Ground Freight, Inc. | | |

Plaintiff submitted the form, and UPS reviewed it no later than May 21, 2013. (SOF ¶ 43.) On the form, which was completed by Dr. Tauran, Dr. Tauran reiterated a diagnosis of "Employee Conflict" and stated that Banuelos was "Able to perform all of her functions, but not while she is with/around the source of the conflict." (SOF ¶ 44.) When asked to identify Plaintiff's work restrictions, the duration of the restrictions, and which activities she could perform within the restrictions, Dr. Tauran answered those questions with: "To be determined by specialist." (SOF ¶¶ 45 & 46.) On May 29, 2013, UPS scheduled an in-person accommodation checklist meeting with Plaintiff to discuss possible job-related accommodations. (SOF ¶ 50.) That meeting was originally scheduled for June 13, 2013, but Plaintiff asked to reschedule it to June 21, 2013. (SOF ¶ 51.) UPS accommodated Plaintiff's request to reschedule the meeting. (Id.) UPS met with Plaintiff in person on June 21, 2013, and walked through its Accommodation Checklist form, which Plaintiff filled out truthfully and completely. (SOF ¶ 52.) Although Dr. Tauran's diagnosis identified "employee conflict," Plaintiff identified her medical condition as "stress, anxiety, headache, back pain, pain in legs." (SOF ¶ 53.) For an accommodation, Plaintiff requested: "Not to have to drive so far to work, puts less strain on my body." (SOF ¶ 54.) In her deposition, Plaintiff testified that, as of June 21, 2013, the only accommodation that would have allowed her to do her job was a shorter commute to work. (SOF ¶ 55.) Plaintiff also testified in her deposition that she agreed that Dr. Tauran's notes did not support her request for a shorter commute. (SOF ¶ 56.)

UPS's regional accommodation committee reviewed Plaintiff's Accommodation Checklist form and Dr. Tauran's notes on July 1, 2013. (SOF ¶ 57.) The regional accommodation committee determined that Dr. Tauran's note "did not describe the medical condition that precludes or impairs the employee's ability to perform the specific job function (question B3)" and "[i]n the checklist meeting documentation, employee outlined other restrictions that were not presented in the medical document." (SOF ¶ 58.) The accommodation committee also noted that Plaintiff had requested a shorter commute, which was not included in the medical documentation from Dr. Tauran. (SOF ¶ 59.) UPS emailed Plaintiff on July 8, 2013, to identify these inconsistencies, and UPS requested additional, more specific, medical information from Plaintiff's doctor. (SOF ¶ 60.) UPS returned a call from Plaintiff on July 10, 2013, in which UPS attempted to clarify the information it needed. (Id.)

On or about August 16, 2013, Plaintiff provided UPS with a second Request for Medical Information form, completed by Dr. Lopez on August 13, 2013 – Plaintiff's treating physician for her back. (SOF ¶ 63.) Dr. Lopez diagnosed Plaintiff with "Lumbar sprain/strain, Anxiety, Insomnia," and listed her only restrictions as: "Patient is unable to sit for long periods of time, limited to lifting, pushing & pulling more than 15 lbs." (SOF ¶ 64.) Plaintiff testified in her deposition that the diagnosis and restrictions in Dr. Lopez's note are completely different than those in Dr. Tauran's note. (SOF ¶ 65.) Plaintiff also testified in her deposition that Dr. Lopez's note did not support her request for a shorter commute. (SOF ¶ 67.) After receiving her August 2013 medical information from Dr. Lopez, UPS explained to Plaintiff that the new medical information still did not support her accommodation request for a shorter commute to work. (SOF ¶ 68.)

By November, Plaintiff still had not provided medical information supporting her need for a shorter commute, so UPS decided to meet with her again in person to try to help her understand what

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-2408 PA (AJWx) | Date | January 4, 2016 |
|---|---|---|---|
| Title | Maria Banuelos v. UPS Ground Freight, Inc. | | |

she needed to do in order to advance her accommodation request. (SOF ¶ 71.) UPS and Plaintiff met for the second checklist meeting on November 26, 2013, but Plaintiff did not arrive with the additional medical information that UPS had requested. (SOF ¶ 72.) Accordingly, the checklist meeting was cut short so Plaintiff could go obtain the medical information that UPS had been requesting for months. (SOF ¶ 73.) Plaintiff provided that medical information later the same day. (SOF ¶ 74.) Plaintiff's third Request for Medical Information form was completed by yet a third healthcare provider, whose names are illegible, but who Plaintiff describes as her "therapists." (SOF ¶ 75.) Plaintiff's therapists diagnosed her with "stress, anxiety, headaches, trouble w/ focus & concentration," and stated that she needed: "The accommodations being a [sic] closer location (25 miles) and a backup helper." (SOF ¶ 77.) According to Plaintiff, she did not actually need a backup helper, and she felt her commute should be limited to 25 minutes or less, not 25 miles or less. (SOF ¶ 78.) In her deposition, Plaintiff acknowledges that her therapists' November 26, 2013 medical note was "the first medical that [she] provided to UPS Freight that said [she] needed to work closer to home." (SOF ¶ 79.)

After receiving Plaintiff's November 26, 2013 medical that finally supported her request for a shorter commute, UPS sought out available Operations Supervisor positions at terminals close to Plaintiff's home. (SOF ¶ 80.) When a position became available at the Commerce ("LOS") facility, the regional accommodations committee approved a transfer for Plaintiff and she was promptly reassigned to the Dispatch Supervisor job at LOS on January 14, 2014. (SOF ¶¶ 80 & 81.)

Plaintiff's paystubs demonstrate that her starting management salary at the time she was promoted to a full-time Operations Supervisor in late February 2011 was $1,010.41 per week ($2,020.83 semi-monthly). (SOF ¶ 98.) Since 2011, Plaintiff's salary has gone up each year. (SOF ¶ 99.) Plaintiff testified that, as a Dispatch Supervisor, she supervised a designated team of approximately 50 drivers. (SOF ¶ 100.) Plaintiff was part of UPS's dispatch team within its Service Centers in Rialto and Commerce, which schedules and manages drivers to ensure pickups and deliveries are done timely. (SOF ¶ 101.) Plaintiff's team of drivers worked a specific shift and performed a defined and permanent function, which was picking up and delivering freight within the boundaries of UPS's Rialto and Commerce assigned delivery areas every day. (SOF ¶ 102.)

Plaintiff testified that, in her current role as a Dock Supervisor, she manages a team of more than 20 dock workers, and spends the majority of her time supervising them. (SOF ¶ 103.) Plaintiff manages the same team of dock workers at UPS's Commerce terminal who load and unload freight from trailers every day on the Inbound shift. (SOF ¶ 104.) In her roles as a Dispatch and Dock Supervisor, Plaintiff testified that she is expected to analyze the performance and behavior of her direct reports and issue appropriate discipline where necessary. (SOF ¶ 105.) As a Dispatch Supervisor, Plaintiff testified that she was responsible for making sure all deliveries and pickups were done timely, working with customers to troubleshoot and resolve their concerns, scheduling pickups and assigning them to drivers based on business demands, and disciplining and holding drivers accountable. (SOF ¶ 110.) Plaintiff was responsible for improving her drivers' efficiency and minimizing labor costs by managing driver work hours. (SOF ¶ 111.) Plaintiff was responsible for troubleshooting the cause of driver breakdowns and accidents, and she held safety meetings with her team. (SOF ¶ 114.) As a Dock Supervisor, Plaintiff assigns her dock workers their work, and she supervises them to make sure they are unloading

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-2408 PA (AJWx) | Date | January 4, 2016 |
|---|---|---|---|
| Title | Maria Banuelos v. UPS Ground Freight, Inc. | | |

trailers in a timely and efficient manner, and are not off task. (SOF ¶ 115.) Plaintiff is responsible for approving her dock workers' hours, and managing labor costs by keeping their hours as low as possible in order to improve the company's bottom line. (SOF ¶ 118.) During her deposition, Plaintiff reviewed UPS's job description for full-time Operations Supervisors (including Dispatch and Dock) and confirmed that the job description correctly describes her "primary job duties," and that she spends most of her time doing the tasks listed in that job description. (SOF ¶ 119.) In her roles as an Operations Supervisor, Plaintiff does not do any manual work. (SOF ¶ 121.)

Plaintiff commenced this action in Los Angeles Superior Court on April 3, 2014. The Complaint alleges claims for: (1) disability discrimination in violation of California's Fair Employment and Housing Act ("FEHA"), California Government Code section 12940(a); (2) discrimination based on perceived disability pursuant to FEHA, California Government Code section 12940(a); (3) failure to provide reasonable accommodation pursuant to FEHA, California Government Code section 12940(m); (4) failure to engage in the interactive process in violation of FEHA, California Government Code section 12940(n); (5) retaliation in violation of FEHA, California Government Code section 12940(h); (6) failure to prevent wrongful conduct in violation of FEHA, California Government Code section 12940(k); (7) failure to pay wages in violation of California Labor Code sections 510, 1194, and Industrial Wage Order 4-2001; (8) failure to authorize and permit rest breaks in violation of California Labor Code section 226.7; and (9) failure to provide itemized wage statements in violation of California Labor Code section 226.

UPS filed a Notice of Removal on December 19, 2014, alleging that this Court possessed diversity jurisdiction over the matter. UPS's Notice of Removal was filed within 30 days of its receipt of interrogatory responses establishing that the amount in controversy exceeded $75,000.00. However, because that Notice of Removal asserted that Plaintiff was a citizen of California based on the Complaint's allegation that Plaintiff was "an individual residing" in Los Angeles County, the Court concluded that UPS had failed to meet its burden to demonstrate the Court's diversity jurisdiction. See Kanter v. Warner-Lambert Co., 265 F.3d 853, 857 (9th Cir. 2001) ("A person residing in a particular state is not necessarily domiciled there, and thus is not necessarily a citizen of that state."). The Court therefore remanded the action to Los Angeles Superior Court. UPS filed a second Notice of Removal on April 1, 2015. This second notice of removal was filed within 30 days of UPS's receipt of discovery responses establishing that Plaintiff is domiciled in California. The Court therefore possesses diversity jurisdiction over this matter. See 28 U.S.C. § 1332(a)(2).

### II.  Analysis

According to UPS, Plaintiff's discrimination claims fail because Plaintiff's alleged anxiety and depression were not a "disability" for purposes of FEHA, but were instead a reaction to her supervisor's management style. UPS additionally asserts that even if Plaintiff could be considered disabled, it had legitimate non-discriminatory reasons for its actions and did not discriminate against Plaintiff, retaliate against her, fail to engage in the interactive process, or fail to prevent wrongful conduct. UPS further asserts that Plaintiff's wage and hour claims fail because the undisputed facts establish that Plaintiff is employed in an executive or administrative capacity. Plaintiff has filed an Opposition in which she

Case 2:15-cv-02408-PA-AJW   Document 34   Filed 01/04/16   Page 7 of 12   Page ID #:1101

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-2408 PA (AJWx) | Date | January 4, 2016 |
|---|---|---|---|
| Title | Maria Banuelos v. UPS Ground Freight, Inc. | | |

argues that she has presented a prima facie case of disability discrimination and triable issues of fact preclude summary judgment on her FEHA and wage and hour claims. In support of that Opposition, Plaintiff has submitted a Declaration in which she testifies to facts that are sometimes at odds with her deposition testimony. See Disc Golf Ass'n, Inc. v. Champion Discs, Inc., 158 F.3d 1002, 1008 (9th Cir. 1998) ("A party cannot create a triable issue of fact, and thus survive summary judgment, merely by contradicting his or her own sworn deposition testimony with a later declaration.").

Plaintiff's FEHA discrimination claims rely exclusively on California law. "California has adopted the [McDonnell Douglas] three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination . . . ." Guz v. Bechtel Nat. Inc., 24 Cal.4th 317, 354, 100 Cal. Rptr. 2d 352, 378 (2000). First, the plaintiff must demonstrate a prima facie case of discrimination; second, if the plaintiff succeeds, the defendant must "articulate some legitimate, nondiscriminatory reason" for its actions; finally, if the defendant meets its burden, the plaintiff must demonstrate "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." See Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1991); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000) (quoting Burdine, 450 U.S. at 253, 101 S. Ct. at 1093).

The degree of proof to demonstrate a prima facie case is minimal, and does not need to rise to the level of a preponderance of the evidence. Coghlan v. Am. Seafoods Co., LLC., 413 F.3d 1090, 1094 (9th Cir. 2005).

> If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision. Although the burden of production shifts to the defendant at this point, the burden of proof remains with the plaintiff at all times. If the employer offers a nondiscriminatory reason, the burden returns to the plaintiff to show that the articulated reason is a pretext for discrimination.

Leong v. Potter, 347 F.3d 1117, 1124 (9th Cir. 2003) (citations omitted). A plaintiff may demonstrate pretext either directly, by persuading the Court that discrimination most likely motivated the defendant, or indirectly, by showing that the defendant's proffered explanation is unworthy of credence. Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1220 (9th Cir. 1998). An explanation is considered unworthy of credence if it is internally inconsistent or otherwise not believable. Chuang v. Univ. of Cal. Davis, Bd. of Tr., 225 F.3d 1115, 1127 (9th Cir. 2000); Guz, 24 Cal. 4th at 363, 100 Cal. Rptr. 2d at 380 ("[I]n an appropriate case, an inference of dissembling may arise where the employer has given shifting, contradictory, implausible, uninformed, or factually baseless justifications for its actions."). However, bare assertions of "discriminatory motivation and intent . . . are inadequate, without substantial factual

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-2408 PA (AJWx) | Date | January 4, 2016 |
|---|---|---|---|
| Title | Maria Banuelos v. UPS Ground Freight, Inc. | | |

evidence, to raise an issue precluding summary judgment." Steckl v. Motorola, Inc., 703 F.2d 392, 393 (9th Cir. 1983); Guz, 24 Cal. 4th at 362, 100 Cal. Rptr. 2d at 384-85 ("[S]ummary judgment for the employer may . . . be appropriate where, given the strength of the employer's showing of innocent reasons, any countervailing circumstantial evidence of discriminatory motive, even if it may technically constitute a prima facie case, is too weak to raise a rational inference that discrimination occurred."); see also Reeves, 530 U.S. at 148 ("For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."); Guz, 24 Cal. 4th at 362, 100 Cal. Rptr. 2d at 384.

  **A. FEHA Claims**

  To prevail on her first and second claims for disability discrimination and discrimination based on a perceived disability, Plaintiff must demonstrate that she: "(1) . . . suffers from [or is perceived to suffer from] a disability; (2) . . . is otherwise qualified to do [her] job; and, (3) . . . was subjected to adverse employment action because of [her] disability." Arteaga v. Brink's, Inc., 163 Cal. App. 4th 327, 344-45, 77 Cal. Rptr. 3d 654, 668 (2008). In its Motion for Summary Judgment, UPS asserts that Plaintiff cannot establish a prima facie case of disability discrimination, or perceived disability discrimination, because Plaintiff does not suffer from, and was not considered to suffer from, a disability. Specifically, an "employee's inability to work under a particular supervisor because of anxiety and stress related to the supervisor's standard oversight of the employee's job performance does not constitute a disability under FEHA." Higgins-Williams v. Sutter Med. Found., 237 Cal. App. 4th 78, 84, 187 Cal. Rptr. 3d 745, 750 (2015).

  Here, Plaintiff's deposition testimony, and the notes provided by her doctors, establish that Plaintiff's anxiety and depression resulted from Pearson's standard oversight of Plaintiff's job performance. Indeed, Plaintiff had never been treated for anxiety or depression until Pearson became her supervisor. Moreover, Dr. Tauran's diagnosis of "employee conflict" and Dr. Tauran's second note stating that Banuelos was "Able to perform all of her functions, but not while she is with/around the source of the conflict" provides no evidence that Plaintiff suffered from a "disability" recognized under FEHA or that UPS perceived that she did. (SOF ¶ 44.)

  Nor does Plaintiff's reference to her back pain state a prima facie claim for disability discrimination. Plaintiff did not mention her back pain until the June 21, 2013 meeting, after she had already been on leave for four months. (SOF ¶ 53.) Plaintiff did not provide any medical evidence of the back pain until submitting the report from Dr. Lopez nearly two months later in August. (SOF ¶ 64.) As Plaintiff admitted in her deposition, Dr. Lopez's note did not support her request for a shorter commute. (SOF ¶ 67.) UPS explained to Plaintiff that the new medical information provided by Dr. Lopez did not support her accommodation request for a shorter commute to work. (SOF ¶ 68.)

  Even if the anxiety, depression, or back pain suffered by Plaintiff could be considered a disability or perceived disability under FEHA, Plaintiff still fails to state a prima facie case because she

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-2408 PA (AJWx) | Date | January 4, 2016 |
|---|---|---|---|
| Title | Maria Banuelos v. UPS Ground Freight, Inc. | | |

suffered no adverse employment action, and even if she did, UPS has satisfied its burden that it had legitimate nondiscriminatory reasons for the actions it took, and Plaintiff has not satisfied her burden to create a triable issue of fact that those reasons are pretextual. Specifically, although Plaintiff contends that the nine month delay between when she went on leave and she was transferred to a location closer to her home to reduce her commute was an adverse employment action, Plaintiff has no evidence to support this claim. Instead, all of the evidence submitted in support of and in opposition to UPS's Motion for Summary Judgment establishes that the delay was entirely the fault of Plaintiff. Far from taking an adverse employment action, UPS repeatedly sought information from Plaintiff that would substantiate her claimed disability and support her request for a shorter commute. See Arteaga, 163 Cal. App. 4th at 347, 77 Cal. Rptr. 3d at 670 ("An employer does not have to accept an employee's subjective belief that he is disabled and may rely on medical information in that respect."). Indeed, within approximately a month of finally receiving a medical report that linked Plaintiff's difficulties to her commute, UPS had accommodated Plaintiff's request for a shorter commute.[1] Plaintiff has no evidence that UPS's insistence that her request for an accommodation for her asserted disability be supported by medical evidence was a pretext for prohibited discrimination. Similarly, there is no evidence that the delay caused by Plaintiff's inability to support her request for an accommodation was retaliatory, or constituted either a failure to engage in the interactive process or to prevent wrongful conduct. As a result, all of Plaintiff's FEHA claims fail and UPS is entitled to judgment on them.

  **B. Wage and Hour Claims**

  Plaintiffs seventh, eighth, and ninth claims allege violations of the California Labor Code and wage orders of California's Industrial Welfare Commission. According to Plaintiff, UPS failed to pay her overtime or provide rest breaks, and, as a result, failed to provide her with accurate wage statements. UPS contends in its Motion for Summary Judgment that Plaintiff was at all relevant times exempt from California's wage and hour laws and regulations because she worked in an executive or administrative capacity.

  To discharge its burden to show an employee was exempt pursuant to the relevant wage order's executive exemption, an employer must demonstrate:

> (1) [the employee's] duties and responsibilities involve management of the enterprise or a "customarily recognized department or subdivision thereof"; (2) [the employee] customarily and regularly directs the work of two or more employees; (3) [the employee] has the authority to hire or terminate employees, or [the employee's] suggestions as to hiring, firing, promotion or other changes in status are given "particular weight"; (4)

---

[1] The Court also notes that Plaintiff's request for a transfer to a location closer to her house did not remove her from the territory supervised by Pearson. In fact, Plaintiff's requested accommodation would never have responded to her initial complaints, documented by Dr. Tauran, to avoid the source of the conflict that resulted in her anxiety and depression.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-2408 PA (AJWx) | Date | January 4, 2016 |
|---|---|---|---|
| Title | Maria Banuelos v. UPS Ground Freight, Inc. | | |

> [the employee] customarily and regularly exercises discretion and independent judgment; (5) [the employee] is primarily engaged in duties that meet the test of the exemption; and (6) [the employee's] monthly salary is equivalent to no less than two times the state minimum wage for full-time employment.

In re United Parcel Service Wage & Hour Cases, 190 Cal. App. 4th 1001, 1014, 118 Cal. Rptr. 3d 834, 842 (2010). The administrative exemption requires a similar, but not identical, analysis:

> In order to establish that [the employee] was exempt as an administrative employee, [the employer] was required to show all of the following: (1) [the employee's] duties and responsibilities involve the performance of office or nonmanual work directly related to management policies or general business operations of [the employer]; (2) [the employee] customarily and regularly exercises discretion and independent judgment; (3) [the employee] performs work requiring special training, experience, or knowledge under general supervision only (the two alternative prongs of the general supervision element are not pertinent to our discussion); (4) [the employee] is primarily engaged in duties that meet the test of exemption; and (5) [the employee's] monthly salary is equivalent to no less than two times the state minimum wage for full-time employment.

Id. at 1028, 118 Cal. Rptr. 3d at 854. For both the executive and administrative exemptions, the employer is "required to establish all of the elements." Id. at 1014, 118 Cal. Rptr. 3d at 842. "Determining whether or not all of the elements of the exemption have been established is a fact-intensive inquiry. The appropriateness of any employee's classification as exempt must be based on a review of the actual job duties performed by that employee." Id. at 1014-15, 118 Cal. Rptr. 3d at 843.

In her Opposition, Plaintiff only attempts to create a triable issue of fact challenging UPS's evidence that she "customarily and regularly exercises discretion and independent judgment" and disputes that she "has the authority to hire or terminate employees." By failing to present argument or evidence concerning the other factors, Plaintiff has waived any dispute as to UPS having established the remaining elements of the executive and administrative exemptions. See id. at 1016, 118 Cal. Rptr. 3d at 844 ("[The plaintiff] does not dispute that he made the requisite salary or that he customarily and regularly supervised two or more employees in each of the three job positions at issue. We therefore need not discuss those two elements.").

As in In re United Parcel Service Wage & Hour Cases, based on the undisputed facts provided in Plaintiff's own deposition and the statements of her supervisors, the Court concludes that Banuelos did exercise the necessary "discretion and independent judgment" to qualify for the executive and administrative exemptions. Like the employee in that case, the "majority of [Plaintiff's] job responsibilities necessarily includes the exercise of discretion and judgment on the matters of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-2408 PA (AJWx) | Date | January 4, 2016 |
|---|---|---|---|
| Title | Maria Banuelos v. UPS Ground Freight, Inc. | | |

significance to UPS operations . . . ." Id. at 1024, 118 Cal. Rptr. 3d at 851; see also (SOF ¶¶ 101, 105, 110, 111, 114, 115, 118.).  There is no factual dispute that Plaintiff's job responsibilities included:

> [T]raining employees and appraising employee performance; imposing
> discipline on [her] own initiative, including having the authority to talk
> with an offending employee to attempt to correct the problem before
> proceeding through the progressive discipline system; "trouble-shooting"
> for operational inefficiencies, determining their "root cause" and making
> appropriate adjustments; developing and implementing "strategic plans"
> or "action plans" for [her] unit on a monthly basis to improve unit
> efficiency; giving advice to employees on how to address problems arising
> in the field; and building customer relationships.

Id. at 1024-25, 118 Cal. Rptr. 3d at 851; see also id. at 1025, 118 Cal. Rptr. 3d at 851 ("Taylor was responsible for making numerous discretionary decisions on a daily basis, with little or no supervision, and usually under time-sensitive, pressure-filled conditions given the nature of the service UPS provides—decisions that impacted how numerous employees under his supervision performed their jobs, including timely responding to problems that developed over the course of the workday.  Because each unit at UPS is dependent on the smooth functioning of the other units, poor decisionmaking or lack of operational discipline in one unit could have real consequences to UPS's business and general good will with its customers.").  Under those circumstances, the California Court of Appeal perceived "no obstacle in concluding as a matter of law that Taylor was customarily and regularly called upon to exercise discretion and judgment in matters of significance to UPS." Id. at 1025, 118 Cal. Rptr. 3d at 852.

The fact that Banuelos was required to adhere to UPS guidelines and processes when making her decisions does not render her non-exempt:

> [W]here government regulations or internal employer policies and
> procedures simply <u>channel</u> the exercise of discretion and judgment, as
> opposed to <u>eliminating</u> it entirely or otherwise constraining it to a degree
> where any discretion is largely inconsequential, the executive exemption
> may still apply.  Supervisors and managers are not rendered mere
> automatons because they must navigate each workday mindful of
> regulations and internal policies governing their work environment and
> the employees they oversee.  Such an interpretation of the language of
> Wage Order 9 would render the exemptions virtually
> nugatory—inapplicable to any employee save for the uppermost tier of
> corporate officers or high-level management.

Id. at 1026, 118 Cal. Rptr. 3d at 853 (emphasis in original); see also id. at 1027, 118 Cal. Rptr. 3d at 853 ("Taylor's opposing evidence showed only that he was required to adhere to some internal guidelines in discharging some of his duties, like the daily plan.  His conclusory declaration did not provide any

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-2408 PA (AJWx) | Date | January 4, 2016 |
|---|---|---|---|
| Title | Maria Banuelos v. UPS Ground Freight, Inc. | | |

material facts indicating, for instance, that in adhering to the daily plan or following a 'decision tree' as a managerial-level employee, he was thereby constrained or limited to one course of action in his decisionmaking. . . . Given the nature of the duties that Taylor admitted he regularly performed in each of his job positions, it belies logic and common sense to equate those duties with rote, mechanical work lacking the requisite degree of discretion. At best, Taylor established there are some internal guidelines and methods that impact his work, but nothing that eliminates or materially constrains his discretion and judgment.").

Although Banuelos may never have participated in the hiring of employees, that fact does not establish that she was misclassified as exempt. Banuelos testified that she analyzes the performance and behavior of her direct reports and issue appropriate discipline where necessary. (SOF ¶ 105.) As a Dispatch Supervisor, Plaintiff testified that she was responsible for making sure all deliveries and pickups were done timely, working with customers to troubleshoot and resolve their concerns, scheduling pickups and assigning them to drivers based on business demands, and disciplining and holding drivers accountable. (SOF ¶ 110.) To satisfy the "authority to hire or terminate employees" element of the exemption test, "the managerial or supervisory employee need not have final authority to hire or fire. It is sufficient if his or her 'suggestions and recommendations as to hiring or firing and as to advancement and promotion or any other change of status of the employee who[m] he supervises will be given particular weight.'" Id. at 1021-22, 118 Cal. Rptr. 3d at 849 (quoting 29 C.F.R. § 541.106). The Court concludes that the oversight and disciplinary functions Banuelos performs satisfy this element of the exemption test.

The job responsibilities Plaintiff performs satisfy all of the elements of the executive and administrative exemptions. Plaintiff has failed to create a triable issue of fact that UPS has misclassified her as an exempt employee. Because she is an exempt employee, her seventh, eighth, and ninth claims for wage and hour violations fail.

### Conclusion

For all of the foregoing reasons, the Court concludes that UPS is entitled to summary judgment on all of Plaintiff's FEHA and wage and hour claims. The Court therefore grants UPS's Motion for Summary Judgment. The Court will issue a separate Judgment consistent with this Order.

IT IS SO ORDERED.